# IN THE COURT OF APPEALS OF IOWA

No. 23-1725
Filed August 7, 2024

**IN THE MATTER OF THE GUARDIANSHIP OF L.W.**

**C.H., Mother,**
     Appellant.

_____

Appeal from the Iowa District Court for Grundy County, Daniel L. Block, Judge.

The mother appeals from an order establishing a guardianship over her child. **AFFIRMED.**

Becky Wilson of Becky E. Wilson, Attorney, PLLC, Iowa Falls, for appellant.

Jamie L. Schroeder of Nelson & Toenjes PLLC, Shell Rock, for appellee.

Shannon D. Simms of Nelson Law Firm, PLLC, Waterloo, attorney for minor child.

Considered by Ahlers, P.J., and Chicchelly and Buller, JJ.

**BULLER, Judge.**

The mother of L.R.L.W. (born 2010) appeals from a juvenile-court order establishing D.D.'s guardianship over the child. Despite first consenting to the guardianship, the mother contends it was no longer needed by trial and that the evidence did not satisfy the statute. Finding the record supports the juvenile court's order and deferring to its credibility findings as appropriate, we affirm.

## I.      Background Facts and Proceedings

The Iowa Department of Health and Human Services (HHS) became involved with the mother and her family most recently in December 2022 and remained involved as of trial in August 2023. HHS's concerns related to the mother's failure to supervise the children and denial of critical care. A safety plan for another child remained in place as of trial, requiring the mother receive mental-health treatment and that her contact with that child be under supervision by another family member. HHS similarly required visits between the mother and L.R.L.W. to be supervised.

For reasons both related and unrelated to the HHS investigation, in the fall of 2022 L.R.L.W. began living with the mother's employer—D.D.—at the mother's request. Shortly after the child moved in, the mother and her two other children joined them, and they all stayed with D.D. until December. L.R.L.W. then moved out with the mother and other children but only stayed a few days in their new residence before asking to move back in with D.D. With the mother's consent, L.R.L.W. moved back and continued to stay with D.D. D.D. reported that L.R.L.W. rapidly changed from a child with significant behavioral issues to "a loving, a dancing, singing, talkative kid."

With assistance from HHS and consent from the mother, D.D. got L.R.L.W. into therapy. A therapist diagnosed L.R.L.W. with post-traumatic stress disorder based on reported mental, verbal, and sexual abuse by the mother's ex-husband. In disclosures made to the therapist, L.R.L.W. reported the mother knew about the physical and sexual abuse and did not stop it. L.R.L.W. also disclosed that the mother sometimes participated in physical abuse by hitting L.R.L.W. with sticks, belts, and her hands. The therapist opined that L.R.L.W. should not be returned to the mother's custody and recommended limiting visitation while L.R.L.W. continued to process her trauma. The therapist also relayed that L.R.L.W. said she was safe in her placement with D.D.

The mother's mental health has been a concern for HHS both in the past and present. In the summer of 2023, the mother was placed at a hospital for inpatient mental-health treatment. According to the HHS worker, the mother needed "crisis stabilization" and was making statements about self-harm. Since then, the mother had been placed under medication management and appeared to be compliant. D.D. testified that she also had concerns about the mother's mental health and its impact on caregiving, noting that while the mother and children lived with her, the mother "never cooked a meal" or engaged in basic parenting like arranging bathing or bedtimes.

HHS put a visitation schedule in place for the mother to see the child. According to HHS, there were "some struggles with . . . attending and timing expressed on both sides"—meaning both by the mother and D.D. D.D. testified that, when the mother visited, the mother just "sits on her butt" rather than play with the children or participate in activities. According to D.D., the mother was

inconsistent on attending visits and had not attended a visit in the three or four weeks preceding trial. But D.D. was willing to facilitate visits with the mother, including through family therapy, in the future.

The juvenile court found that, since residing with D.D., L.R.L.W. "has thrived." She was well-socialized with other children in the home and wished to remain there. L.R.L.W. also had contact with her siblings and was doing well in school. An HHS supervisor reported that the child told a worker she wanted to stay with D.D. because "she felt safe there" and was "scared to put her trust in her [mother] again" based on issues in the past.

In terms of court papers, D.D. petitioned for guardianship in January 2023. At first, the mother consented. But she revoked that consent in June, and the matter was set for contested trial.

At trial that August, the mother offered testimony from a cousin whose home she and another of her children were then living with. The cousin testified that there was plenty of room in the house for L.R.L.W. to move in with them, and that—from what she had seen—the mother did not have parenting deficits in caring for her two other children. The cousin also testified that she believed the mother was compliant with medication while staying with her.

The mother testified and described her hope L.R.L.W. would move in with her at the cousin's home. She said she consented to the guardianship at first because she was "unmedicated" and believed D.D. could "protect" L.R.L.W. from the man that sexually abused her. The mother explained that she believed she was now ready to care for L.R.L.W. because she had started therapy and complied with her medication regimen.

HHS did not take a position on the guardianship at trial, except to note there were no safety issues with D.D.'s house but returning the child to the mother would require a safety plan barring any unsupervised contact. L.R.L.W.'s attorney told the court she had met with the child and agreed she had "flourished" while in D.D.'s care. The child's attorney also reported that L.R.L.W. felt "safe and loved and cared for" with D.D. and that she wished to remain there and did not believe the mother could adequately protect or care for her. The child's attorney recommended the court grant continued guardianship to D.D. and set appropriate parameters for visitation, possibly including family therapy. And the child's attorney voiced that, if a guardianship wasn't granted, it would be proper to make a referral for the county attorney to open a child-in-need-of-assistance case for L.R.L.W. to ensure her safety.

The juvenile court made a credibility finding in determining that, by revoking consent for the guardianship, the mother "does not seek to protect the child's best interests, only to protect her own." The court found clear and convincing evidence supported the need for a guardianship, that a limited guardianship was not appropriate, and that D.D. was a suitable and appropriate guardian. The juvenile court also found the mother had not "provided any financial or emotional support" for L.R.L.W. while in D.D.'s care. The juvenile court ordered D.D. to make reasonable efforts to facilitate a continued relationship between the mother and L.R.L.W., subject to reasonable restrictions and the child's best interests.

The mother appeals. The father is not in the picture and was not involved with these proceedings.

## II.    Standard of Review

D.D. contends the standard of review is de novo, while the mother's brief does not include a standard-of-review section as required by our rules. *See* Iowa R. App. P. 6.903(2)(a)(8)(2). "[A] guardianship is equitable in nature, so our review is de novo." *In re Guardianship of L.Y.*, 968 N.W.2d 882, 892 (Iowa 2022); *see also In re Guardianship of B.B.*, No. 21–0992, 2022 WL 523325, at *3 (Iowa Ct. App. Feb. 22, 2022) ("Our standard of review of the establishment of a guardianship of a minor is de novo.").

## III.    Discussion

The mother first contests proof on her lack of consistent parental participation, as required by the governing statute:

> b. There has been a demonstrated lack of consistent parental participation in the life of the minor by the parent. In determining whether a parent has demonstrated a lack of consistent participation in the minor's life, the court may consider all of the following:
>> (1) The intent of the parent in placing the custody, care, and supervision of the minor with the person petitioning as a de facto guardian and the facts and circumstances regarding such placement.
>> (2) The amount of communication and visitation of the parent with the minor during the alleged de facto guardianship.
>> (3) Any refusal of the parent to comply with conditions for retaining custody of the minor set forth in any previous court orders.

Iowa Code § 232D.204(1)(b) (2023). Part of the mother's specific allegation is that D.D. made it difficult for her to be involved in the child's life. But the record affirmatively establishes the problems with visitation were on both sides—D.D.'s and the mother's—and we do not find they undermine proof of the mother's failure to consistently participate in parenting. Instead, we (like the juvenile court) credit

the testimony of D.D. regarding the mother's lack of participation when she did attend visitation, as well as her failure to provide any financial support for L.R.L.W. And to the extent the mother now asserts on appeal that distance and transportation were barriers to visitations, we find that assertion undercut by the mother's sworn testimony at trial that transportation was not a problem or difficulty for visits. We agree with the juvenile court this element was proven by clear and convincing evidence.

The mother's second contention is that she was willing and able to do all of the functions and utilize all the powers the court would grant a guardian. *See id.* § 232D.204(2)(a). She does not contest the other prong of that section at paragraph (b)—that guardianship is in the child's best interests. We conclude the record belies the mother's claim she was willing and able to serve as parent and guardian. The mother is currently under a safety plan with HHS regarding other children, and HHS had been involved for approximately eight months leading up to trial. The mother's visits with those children remained supervised, reflecting ongoing parenting concerns. And like the juvenile court, we are concerned about the mother's mental-health hospitalization just months before trial, as well as her inability to successfully assume the parental role for as short a period as one-hour visitations with L.R.L.W. While we recognize the mother has made strides toward improving her parenting capabilities—and we hope she continues to make improvements—we nonetheless agree with the juvenile court that, as of trial, the mother was unable to fulfill the role of parent and guardian.

**AFFIRMED.**